UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOHNNY MARTIN,<br><br>Defendant. | Case No.: 18-CR-2835-GPC<br><br>**ORDER GRANTING MOTION FOR NEW TRIAL.**<br><br>**[ECF Nos.  72, 73, 80, 83, 87, 88, 89, 90, 93, 94, 99, 100.]** |

On October 4, 2019, following a three-day trial, a jury found Defendant Johnny Martin guilty of one count of False Statement to a Federal Agency in violation of 18 U.S.C. § 1001(a)(2). (ECF No. 66.) Mr. Martin immediately filed a motion for new trial and a motion for judgment of acquittal, which were then fully briefed, (ECF Nos. 72, 73, 80, 83, 87, 88, 89, 90, 93, 94), and heard on January 24, 2020 and March 12, 2020. (ECF Nos. 92, 95, 102.)

At the March 12, 2020 hearing, the motion for judgment of acquittal was **DENIED** and the motion for new trial was continued for further briefing. (ECF Nos. 99, 100.) Upon consideration of the moving papers, the evidence presented at trial, the jury's deliberations, questions, and verdict, as well as the post-trial briefing and applicable law, the Court **GRANTS** Defendant's motion for new trial for the reasons set out below.

1

# I.   BACKGROUND

## A. Procedural Background

The Indictment in this case was returned by a federal grand jury on June 7, 2018, (ECF No. 1), and the matter proceeded to trial on September 30, 2019. (ECF No. 61.) A three-day trial was held from September 30, 2019 to October 2, 2019, (ECF No. 61–63), after which the jury deliberated on October 3 and 4, 2019. (ECF Nos. 64–65.)

After the jury returned its guilty verdict, Defendant filed a motion for new trial. (ECF Nos. 72, 83.) On January 17, 2020, the Government filed a response, (ECF No. 88), and, on January 21, 2020, Defendant filed a reply. (ECF No. 89.)

The Court held an initial hearing as to Defendant's motions on January 24, 2020. (ECF No. 92.) At the hearing, the Court *sua sponte* raised the lack of juror unanimity as a potential issue and permitted the Parties to file supplemental briefs on the issue. (*Id.*) The Government filed a supplemental brief on February 14, 2020, (ECF No. 93), and then Defendant filed a supplemental response brief on February 28, 2020. (ECF No. 94.)

On March 12, 2020, the Court held a second hearing on Defendant's post-trial motions. (ECF Nos. 95, 102.) At the hearing, the Government requested permission to file additional briefing on the unanimity issue, which the Court granted. The Government filed a second supplemental brief on March 16, 2020, (ECF No. 99), and then Defendant filed a second supplemental response brief on April 9, 2020. (ECF No. 100.)

## B. Factual Background

### 1.  The Indictment & Investigation

The Indictment charges Defendant with one count of False Statement to Federal Agency, 18 U.S.C. § 1001(a)(2). (ECF No. 1 (hereinafter, "Ind.")) The introductory allegations state that Mr. Martin was a Group Supervisor with Homeland Security Investigations ("HSI") until his retirement in February 2016. (Ind. at ¶ 1.) In that capacity, Mr. Martin routinely conducted records checks in the TECS database and

supervised HSI Special Agents. (Ind. at ¶ 2.) From 2010–2012, Mr. Martin supervised an HSI Special Agent who was in contact with R.H., a cooperating individual. (Ind. at ¶ 3.)

The Indictment further alleges that, on June 30, 2015, R.H. directly emailed Mr. Martin the name and date of birth of a person referred to as Individual 1. (Ind. at ¶ 4.) On the following day, Mr. Martin searched the TECS database for Individual 1's name and then sent an email on July 2, 2015 from his personal account to R.H. with an attachment entitled "Records checks–[Individual 1's last name]." (ECF No. 74, Tr. 218–20; ECF No. 75, Tr. 447–49.) That attachment contained Individual 1's personal identifiable information, immigration history, and criminal history (referred to as the "Records Check Document"). (ECF No. 75, Tr. 448.)

On June 7, 2017, while investigating R.H. and others for an immigration-related fraud scheme, Federal Bureau of Investigation (FBI) agents interviewed Mr. Martin at his home about the Records Check Document that had been emailed by Mr. Martin to R.H. (ECF No. 75, Tr. 340–413; ECF No. 76, Tr. 680–717.) After being shown various documents, including the Records Check Document for Individual 1, Mr. Martin "denied sending the Records Check Document to R.H.," in four statements: (a) "I don't have an explanation why [R.H.] has it."; (b) "[F]or me to send [the Records Check Document] to him, I don't see myself ever doing that . . ."; (c) "I didn't send stuff like that to him . . ."; and (d) "If I sent him emails, but I wouldn't attach something like [the Records Check Document] to it." (Ind. at ¶ 7.)

Count One of the Indictment charges that Defendant "did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States by stating and representing to FBI agents that he did not send the Records Check Document to R.H." (Ind. at ¶ 9.) Count One "reallege[d] and incorporate[d] by reference" the four statements referenced in the Introductory Allegations. (Ind. at ¶ 8.) The Indictment adds

1  that Defendants' "statements and representations were false because, as [Defendant] then

2  and there knew, he sent the Records Check Document to R.H." (Ind. at ¶ 9.)

3  ### 2.  The Trial Testimony

4  As background relating to the investigation which led to the alleged false

5  statements, FBI Special Agent Angela Pennington testified as to an extensive

6  immigration fraud scheme run by Mr. Hardev Panesar and Mr. Rafael Hastie, the

7  individual referred to in the Indictment as R.H. (ECF No. 74, Tr. 200–40.) Special Agent

8  Pennington described how the Government learned that Panesar and Hastie posed as

9  employees of the Department of Homeland Security ("DHS") and conned immigrants to

10  pay exorbitant fees for the promise of green cards. Part of the scheme involved Panesar

11  and Hastie utilizing information that appeared to come from a Government source. (ECF

12  No. 74, Tr. 215.) [1]  Government investigators learned that both Mr. Panesar and Mr.

13  Hastie had worked as confidential informants for the FBI and HSI, with Mr. Hastie

14  having worked with Mr. Martin and his HSI agents over the course of several years.

15  (ECF No. 75, Tr. 279–98, 330–36, 504–535, 561–95.)

16  The Government then called Special Agent Jennifer Wolf to testify as to the

17  interview of Mr. Martin. Much of Agent Wolf's testimony was interlaced with an audio

18  recording of that interview. The transcript for the audio, however, contained many

19  notations denoting "overlapping" questions and answers, as well as "unintelligible" audio

20  segments. (ECF No. 75, Tr. 384–85.)

21  The Parties offered contradicting testimony as to what was and was not captured

22  by the recording. Of critical importance, Agent Wolf testified that she showed Mr. Martin

23  three documents consisting of the Constantino Rivas-Pedrisco Record Check (i.e., the

---

[1] The background evidence was only offered to contextualize the charges against the Defendant as the
Parties stipulated "that there [wa]s no evidence that Mr. Martin was involved in or had knowledge of the
Panesar/Hastie immigration fraud scheme before he was interviewed on June 7, 2017." (ECF No. 75, Tr.
488.)

"Records Check Document"), the Corona Record Check, and a third document overlaid with a screenshot of its Microsoft properties. (ECF No. 75, Tr. 355–57.) Agent Wolf, however, was impeached with two of her own e-mails before trial. The e-mails indicated that she only "showed [Mr. Martin] the record checks on Word document on Corona," (ECF No. 75, Tr. 379), and not the Records Check Document (the Rivas-Pedrisco Record Check). Mr. Martin, moreover, claimed that he was only shown two papers – not three. (ECF No. 76, Tr. 619–20.) Agent Wolf also testified that Mr. Martin reviewed all three documents for some time in a calm manner. (ECF No. 75, Tr. 359–60.) Upon reviewing the documents, he became quiet and pushed the table away, as his breathing got a little heavy. (ECF No. 75, Tr. 362–63.) Mr. Martin, in contrast, claimed he looked at the documents for seconds, without his glasses, and while in an anxious state. (ECF No. 76, Tr. 620–22.)

A review of the interview transcript reveals that Agent Wolf never explicitly asked Defendant about a Records Check pertaining to Constantino Rivas-Pedrisco. (ECF No. 76, Tr. 631, 682–83.) Instead, Agent Wolf mentioned "Corona" twice, and misspoke in naming another person, "Tomas Rivas." (ECF No. 75, Tr. 374, 361, 387.) As to the names on the documents, Mr. Martin can be heard on the audio trying to briefly sound out a name by stating "GRU . . .", though no name beginning with those letters exists on the Constantino Rivas-Pedrisco Record Check. (ECF No. 75, Tr. 386–87.)

The Government, in its case-in-chief, offered testimony relating to cellphone records and e-mails belonging to Mr. Panesar, Mr. Hastie, and Mr. Martin, as well as Mr. Martin's TECS searches. The Government also explained how the TECS database and other databases related to border enforcement function. (ECF No. 74, Tr. 168–94.) As the linchpin of its case, the Government introduced an e-mail from Mr. Martin to Mr. Hastie on July 2, 2015 attaching a document pertaining to Constantino Rivas-Pedrisco. (ECF

No. 69, Exs. 9C, 9D; ECF No. 75, Tr. 448–49.) The Rivas-Pedrisco document attached to the July 2, 2015 email is the Records Check Document referenced in the Indictment.[2]

### 3. Jury Deliberations

The Court instructed the jury prior to its deliberations. (ECF No. 76, Tr. 798.) Among other things, the Court informed the jury that it "must follow all the[] instructions and not single out some and ignore others." (ECF No. 76, Tr. 737.) The Court stated that the instructions were "all important," and that the jury had a "duty to apply the law as [the Court] g[a]ve it . . . and the facts as [the jury] f[ou]nd them." (ECF No. 76, Tr. 737.) The Court explained that the Defendant was charged in a single count and detailed the elements of the offense. (ECF No. 76, Tr. 744.) The Court also affirmed that the "Government has the burden of proving every element of the charge beyond a reasonable doubt." (ECF No. 76, Tr. 738.)

As to unanimity, the Court offered a general instruction, stating "Your verdict, whether guilty or not guilty, must be unanimous." (ECF No. 76, Tr. 798.) The Court then repeated itself, "It is important that you attempt to reach a unanimous verdict." (ECF No. 76, Tr. 798.) Neither side requested, and the Court did not give, a special instruction addressing an unanimity requirement as to the four particular statements outlined in the Indictment. (ECF No. 1 at ¶ 9; ECF No. 76, Tr. 747, 762.)

On the morning of October 4, 2019, the jury submitted two notes to the court after deliberating for one day and a half. (ECF No. 78, Tr. 819.) The first note read, "Do we find guilty if any of the statements in the indictment are false, or do they all have to be false?". (ECF No. 78, Tr. 819.) The second note read, "In Jury Instruction Number 4, it states that if there is a lack of evidence, we need to find defendant not guilty. Can audio

---

[2] This is made clear by the Government's closing argument where it acknowledges that Mr. Martin was "only charged with four specific lies pertaining to the Constantino Rivas record check in the Indictment, and Constantino Rivas is Individual 1." (ECF No. 76, Tr. 751–52.)

1  evidence not being clear – many parts of audio not clear – would this be lack of

2  evidence? Is this part of the definition of 'lack of evidence'?". (ECF No. 78, Tr. 823–24.)

3  Before the Court was able to consult with counsel and provide a response to the jury's

4  questions, the jury reached a verdict and found Defendant guilty of making a false

5  statement. (ECF No. 78, Tr. 826–28.)

6  **II.  LEGAL STANDARD**

7      **A. Legal Standard for Unanimity**

8      "A defendant in a federal prosecution has a constitutional right to a unanimous jury

9  verdict." *United States v. Gonzalez*, 786 F.3d 714, 716–17 (9th Cir. 2015) (citing *United*

10 *States v. Garcia–Rivera*, 353 F.3d 788, 792 (9th Cir. 2003)); *see also* Fed. R. Crim. P.

11 31(a). For a verdict to be unanimous, the jury must reach "more than a conclusory

12 agreement that the defendant has violated the statute in question; there is a requirement of

13 substantial agreement as to the principal factual elements underlying a specified offense."

14 *McKoy v. North Carolina*, 494 U.S. 433, 450 n.5 (1990). In other words, a "jury in a

15 federal criminal case cannot convict unless it unanimously finds that the Government has

16 proved each element." *Richardson v. United States*, 526 U.S. 813, 817 (1999).

17      In the context of a false statements case, the jury must arrive unanimously at the

18 conclusion that at least one, specific statement was false. *See Vitello v. United States*, 425

19 F.2d 416, 423 (9th Cir. 1970) ("To return a verdict, the jury was required to be

20 unanimous on the appellant's guilt. Under the court's instructions, the only manner in

21 which the jury could arrive at a unanimous verdict was to find guilt beyond a reasonable

22 doubt on one or more of the three specifications of perjury.")

23      "Normally, a general instruction on the requirement of unanimity suffices to

24 instruct the jury that they must be unanimous on whatever specifications form the basis of

25 the guilty verdict." *United States v. Lapier*, 796 F.3d 1090, 1096–97 (9th Cir. 2015)

26 (quoting *United States v. Payseno*, 782 F.2d 832, 835 (9th Cir. 1986)). "When it appears,

27 however, that there is a genuine possibility of jury confusion or that a conviction may

28                                                7

occur as the result of different jurors concluding that the defendant committed different acts, the general unanimity instruction does not suffice." *United States v. Echeverry* ("*Echeverry II*"), 719 F.2d 974, 975 (9th Cir. 1983); *Vitello*, 425 F.2d at 419 (noting that the judgment should be reversed if it is found "(1) that there was insufficient evidence to be submitted to the jury on any one or more of the specifications of falsity, or (2) that the court's instructions on unanimity were not sufficiently clear or specific to warrant our drawing the inference that the jury understood that it must find unanimous agreement of guilt on one or more of the specifications before it could return a verdict of guilty.")

In evaluating whether such a "genuine possibility" of jury confusion exists, a Court may consider a variety of factors. *See, e.g.*, *Jeffries v. Blodgett*, 5 F.3d 1180, 1195 (9th Cir. 1993) (the complexity of the evidence); *United States v. Gilley*, 836 F.2d 1206, 1212 n.8 (9th Cir. 1988) (the clarity and presentation of the government's argument); *United States v. Frazin*, 780 F.2d 1461, 1468 (9th Cir. 1986) (the text of the indictment); *United States v. Ferris*, 719 F.2d 1405, 1407 (9th Cir. 1983) (the clarity or ambiguity of the jury instructions); *United States v. Echeverry* ("*Echeverry I*"), 698 F.2d 375, 377 (9th Cir.), *reh'g denied and opinion modified*, 719 F.2d 974 (9th Cir. 1983) (the jury's written questions). Ultimately, to "correct any potential confusion in such a case, the trial judge must augment the general instruction to ensure the jury understands its duty to unanimously agree to a particular set of facts." *Echeverry II*, 719 F.2d at 975.

**B. Analysis**

In the instant matter, Defendant Johnny Martin was found guilty of making a false statement to FBI Special Agent Jennifer Wolf and Task Force Officer Monica Williams during an interview at his home on June 7, 2017. Defendant's conviction stems from a one-count Indictment which contains four particular false statements. Here, the Parties dispute whether the Court erred by failing to instruct the jury that it must find unanimously that at least one of the statements offered by the government met the elements of 18 U.S.C. § 1001(a)(2) beyond a reasonable doubt.

8

1    The Government argues that the Court's general instruction on unanimity was

2    sufficient, and that a special instruction was not required because the evidence was not

3    factually complex, the indictment was not broad or ambiguous, and the jury notes did not

4    indicate that there was jury confusion. (ECF No. 93 at 3–9; ECF No. 99 at 2–6

5    (evidence), 6–10 (jury note), 11–15 (jury instructions)).

6         The Defendant asserts, on the other hand, that the instant verdict presents various

7    unanimity-related issues, including that the indictment and jury instructions confused the

8    jury as shown by its note and that "it is now impossible to know whether the jury found

9    one or all of the introductory statements to be false." (ECF No. 94 at 2–4.) Defendant,

10   moreover, rejects the Government's characterization of the legal standard on unanimity,

11   and attempts to distinguish the Government's cited cases. (*Id.* at 5–8.) In his most recent

12   submission, Defendant re-asserts the need for a specific unanimity instruction, (ECF No.

13   100 at 1–7), and argues once again that the Government's treatment of the Indictment

14   amounts to a constructive amendment. (*Id.* at 7–9.)

15        In view of the Indictment's structure, the language of the false statements, the

16   evidence introduced at trial, the absence of necessary jury instructions, the jury's notes

17   during deliberations, and the applicable law, the Court finds that a "genuine possibility"

18   of jury confusion existed on the issue of unanimity. Consequently, the Court was required

19   to augment the general unanimity instruction prior to the return of the verdict. Based

20   upon the Court's failure to do so, the Court **GRANTS** Defendant's motion for new trial.[3]

---

[3] In addition to the multiple factors for jury confusion, the Government also argues that each of the statements charged in the Indictment are alternate means of committing the charged conduct not requiring unanimity. (ECF No 99 at 8–10.) However, as the cases cited by the Government show, such "means," as distinguished from the elements of a crime, are typical of alternately phrased statutory clauses. *See United States v. Mickey*, 897 F.3d 1173, 1181 (9th Cir. 2018) (quoting 18 U.S.C. §§ 1591(a), (b)(1)) ("the statute on its face indicates that the listed alternatives—"means of force, threats of force, fraud, coercion ... or any combination of such means"—are not elements but rather possible means to commit the crime of human trafficking.") (emphasis removed); *United States v. Kim*, 196 F.3d 1079, 1083 (9th Cir. 1999) ("Title 18 U.S.C. § 2 prohibits aiding, abetting, counseling, commanding,

9

1

### 1. The Indictment's ambiguity bred jury confusion.

As a starting point, the Court reviews the Indictment. "[T]he specificity of an indictment is relevant in assessing the need for a specific unanimity instruction." *United States v. Lee*, 19 F.3d 31 (9th Cir. 1994). A specific unanimity instruction "may be required in cases where the indictment is sufficiently broad and ambiguous so as to present a danger of jury confusion." *United States v. Anguiano*, 873 F.2d 1314, 1319 (9th Cir. 1989).

Here, the Indictment contains nine paragraphs, seven of which constitute the Introductory Allegations and two which constitute Count I. (ECF No. 1.) Count I charges:

> On or about June 7, 2017, within the Southern District of California, defendant JOHNNY MARTIN did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States by stating and representing to FBI agents that he did not send the Records Check Document to R.H. The statements and representations were false because, as defendant JOHNNY MARTIN then and there knew, he sent the Records Check Document to R.H.

(Ind. at ¶ 9.) The Government argues that the Indictment was neither broad nor ambiguous, and thus did not confuse the jury. (ECF No. 93 at 7–8.) The Court, however, finds that the Indictment was ambiguous in multiple ways such that it created the likelihood of jury confusion in evaluating the Government's case.

_____

inducing or procuring the commission of a crime. These six prohibited acts are merely alternative means by which a defendant may be held criminally liable for the underlying substantive offense."). As to the charged statute here, 18 U.S.C. § 1001, an analysis of "means" and "elements" might be applicable, for example, to the sequence of verbs in § 1001(a)(1) ("falsifies, conceals, or covers up by any trick, scheme, or device a material fact"). However, because the four statements charged in the Indictment are not alternating verbs of the statute, but rather independent statements which, if proven to be false and material, might constitute "separate offenses subject to separate jury findings," *Schad v. Arizona*, 501 U.S. 624, 633 (1991), the Court does not find that each statement is merely a "means" of violating of 18 U.S.C. § 1001 not requiring unanimity.

First, the charging language at paragraph nine does not specify its relationship to the four statements in introductory paragraph seven. There, the Indictment alleges that Mr. Martin "denied sending the Records Check Document to R.H." in four statements: (a) "I don't have an explanation why [R.H.] has it."; (b) "[F]or me to send [the Records Check Document] to him, I don't see myself ever doing that . . ."; (c) "I didn't send stuff like that to him . . ."; and (d) "If I sent him emails, but I wouldn't attach something like [the Records Check Document] to it." (Ind. at ¶ 7.); *cf., United States v. Folsom*, 661 F. App'x 495 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 1598 (April 17, 2017) (three alleged false statements immediately followed language charging false statement). The Indictment does not clarify whether the four statements in paragraph seven constitute, jointly or severally, the charged false statement in "representing to FBI agents that he did not send the Records Check Document to R.H." (*Id.*) Nor does paragraph nine state that the false representation(s) at issue are limited to the text of the Indictment, which is of concern because, as the Government recognizes, "there was no instruction that the four particular statements were contained in the single count." (ECF No. 93 at 10 n.2.)

Next, the Indictment invites confusion by not identifying the subject of the Records Check Document, Individual 1, who according to the Government's presentation at trial was Constantino Rivas-Pedrisco. This is particularly problematic because Special Agent Wolf had advised the U.S. Attorney's Office before trial that the documents shown to Mr. Martin at the interview related to Corona and not Rivas-Pedrisco. (ECF No. 75, Tr. 379.)

Finally, Mr. Martin's statements are less than clear because they combine dissimilar terms and pronouns (e.g., "it," "like that"), and cannot be understood in context without first considering large amounts of evidence consisting of audio recordings, e-mails, testimony, and supporting documents. While two of Defendant's statements are more direct denials (namely, "I didn't send . . ." and "I wouldn't attach . . ."), the other two statements are more hypothetical and imprecise (namely, "I don't see myself . . ." and "I don't have an explanation . . ."). *Cf. Vitello v. United States*, 425 F. 2d 416, 417

11

1  (9th Cir. 1970) (defendant falsely swore he never placed a bet with any bookmaker in the

2  U.S. other than a Mr. Harrison; that he did not know Charles Otis Spencer; and, that he

3  never placed a bet with Ruth Hughes). As events unfolded at trial, these imprecise,

4  ambiguous statements created a "genuine possibility" of juror confusion.[4]

5            **2.  The Government's case was circumstantial, supported by a poor**

6                 **recording, and argued in a manner likely to create jury confusion.**

7        The "complex nature of the evidence" can also be a factor in the Court's

8  assessment of jury confusion. *See United States v. Frazin*, 780 F.2d 1461, 1468 (9th Cir.

9  1986). As a general matter, more factually complex cases tend to increase the likelihood

10  of jury confusion because they "create a risk that different jurors voted to convict on the

11  basis of different facts establishing different offenses." *United States v. Lapier*, 796 F.3d

12  1090, 1097 (9th Cir. 2015); *see also United States v. Lee*, 19 F.3d 31 (9th Cir. 1994)

13  (detailing conduct over a year and a half in time, including "several acts akin to those

14  charged in the indictment"); *United States v. Payseno*, 782 F.2d 832, 837 (9th Cir. 1986)

15  ("there exists the genuine possibility that some jurors may have believed Payseno used

16  extortionate means on one occasion while others may have believed that he was guilty of

17  engaging in extortion at a different time and place"); .

18        On the other hand, cases with simpler facts reduce the likelihood of jury confusion.

19  *See United States v. Kim*, 196 F.3d 1079, 1082 (9th Cir. 1999) (relying, in part, on the

20  fact that the defendant "was charged with only a single crime, based upon a single set of

21

22  _____

23  [4] Defendant also asserts that the Government's interpretation of the Indictment varies from the text itself. (ECF No. 100 at 7–9; ECF No. 94 at 3–5.) Defendant maintains that the Indictment has a single

24  charge, i.e., "that defendant falsely 'represented' that he did not send a specific document to Rafael Hastie," while the Government "argued, and the jury apparently understood, the indictment to allege

25  four separate false statements." (ECF No. 100 at 7–8). Defendant frames this argument as alleging a constructive amendment of the Indictment. *See United States v. Mancuso*, 718 F.3d 780, 792 (9th Cir.

26  2013) (noting that "constructive amendment occurs when the defendant is charged with one crime but, in effect, is tried for another crime."). Because the Court finds that the Indictment, among other factors,

27  created confusion here, the Court does not decide this argument separately.

28

facts: aiding and abetting the possession of stolen goods on February 17, 1996 at the Anaheim warehouse"); *United States v. Smith*, 131 F.3d 150, at *1 (9th Cir. 1997) (finding that in the "case of a two-count indictment involving a bank robbery on one day . . . [t]here was no genuine possibility of jury confusion about which guns [the defendant] aided and abetted in the use of.").

Upon first glance, the facts here parallel those in *Kim*. (ECF No. 99 at 8.). The subject statements were given during the same conversation between Defendant, Agent Wolf, and Officer Williams. (*Id.*) They pertain to the same topic, namely, whether Mr. Martin "den[ied] sending the Rivas-Pedrisco Records Check to Hastie." (*Id.*) The same piece of evidence – i.e., an email from Defendant to Hastie attaching the Rivas-Pedrisco Records Check document – also proves that Defendant sent the document to Hastie. (ECF No. 69, Exs. 9C, 9D). And, that e-mail was introduced by a single witness. (ECF No. 75, Tr. 448–49.)

However, this narrow view of the facts ignores the circumstantial nature of the case, the unintelligible portions of the recording where the false statements were made, and the Government's errors in describing the evidence, both in pre-trial email communications and in its opening statement. This combination of deficiencies and inaccuracies increased the difficulty of understanding and processing the evidence at trial, and thus created a risk that the jurors voted to convict based on different statements.

First, there is the audio tape recording, which all agree is the best evidence of Mr. Martin's statements. The quality of the recording is very poor, and it is difficult to decipher. The transcript provided as an aid for the jury reflects the inaudible nature of the recording in its many denotations of "overlapping" questions and answers, and of "unintelligible" audio. (ECF No. 75, Tr. 384–85.) The audio was so confusing, in fact, that the jury submitted a note during deliberations asking, "Can audio evidence not being clear – many parts of audio not clear – would this be lack of evidence? Is this part of the definition of 'lack of evidence'?". (ECF No. 78, Tr. 823–24.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Then, there is the Government's presentation. Count One charges Defendant with the false denial that he sent Rafael Hastie a Records Check Document pertaining to Constantino Rivas-Pedrisco (i.e., "Individual 1.") (Ind. at ¶ 9.) The Indictment identifies four allegedly false statements, which seem not be made in response to specific questions, and which lend themselves to differing interpretations by the jury.[5] In spite of this, the Government erroneously claimed in its opening statement that the evidence would show Mr. Martin was asked "Did you send this document to Rafael Hastie?", and that Mr. Martin told four "lie[s]" in response to the question. (ECF No. 74, Tr. 149.) The Government further asserted that "[Mr. Martin] was asked these questions" and that the "[q]uestions weren't ambiguous." (ECF No. 75, Tr. 150.) Thus, from the beginning, the jury was misinformed as to the evidence that would be presented because Special Agent Wolf never asked that question. Instead, Mr. Martin volunteered these statements in a stream-of-consciousness, freeform manner, thereby making it necessary for the jury to ascertain the meaning of the statements in context.

Further complicating the jury's consideration of the evidence are the conflicting facts as to which documents Mr. Martin reviewed on June 7, 2017, and how he reviewed them. (*See* ECF No. 94 at 4–5; ECF No. 99 at 2–6; ECF No. 100 at 2–3.) As noted, the Indictment alleges that Mr. Martin used "that" and "it" in his false statements to refer to the Rivas-Pedrisco Records Check. Thus, in order to connect "that" and "it" to the Rivas-Pedrisco Records Check specifically, Special Agent Wolf testified that she presented three documents, including the Rivas-Pedrisco Records Check, to Mr. Martin. (ECF No. 75, Tr. 355–57, 379.) However, Special Agent Wolf was impeached with two e-mails

---

[5] As noted above, the statements as stated in the transcript of the subject interview are: (a) "I don't have an explanation for why he has it," (ECF No. 87-1 at 25:13–14); (b) "for me to send it to him, I don't see myself ever doing that . . .," (ECF No. 87-1 at 25:17–18) (c) "I didn't send stuff like that to him . . .," (ECF No. 87-1 at 26:12–13); and (d) "I sent him e-mails, but, uhm, I wouldn't attach something like that to it . . .". (ECF No. 87-1 at 27:23–24.)"

18-CR-2835-GPC

sent before the trial, which instead reported that she only showed Mr. Martin the *Corona* record checks document. (*Id.*) In addition, Agent Wolf never asked Defendant about a record checks pertaining to Constantino Rivas-Pedrisco during the June 7, 2017 interview. (ECF No. 76, Tr. 631, 682–83.) Rather, as she asked about the record checks, Special Agent Wolf mentioned "Corona" twice and brought up a non-existent person, "Tomas Rivas." (ECF No. 75, Tr. 374, 361, 387.) Defendant's testimony further complicated the jury's factfinding role by disputing the Government's account.[6]

Lastly, the case was further complicated by a significant amount of background information covering events, e-mails, cellphone records, and investigations ranging from February 2014 and extending through June 2018. For example, the record includes Agent James Downey's discussion of how the TECS database and other law enforcement databases function, how the Office of Professional Responsibility oversees their use, and how various TECS policies relate to this case. (ECF No. 74, Tr. 168–94.) The Government's case-in-chief also contained an explanation by Special Agent Angela Pennington of an extensive immigration fraud scheme run by Hardev Panesar and Rafael Hastie, including the Government's efforts to investigate that scheme using undercover agents, confidential informants, wiretaps, search warrants, and other forms of surveillance. (ECF No. 74, Tr. 200–40.) The record likewise contains additional information on Mr. Panesar and Mr. Hastie's work as informants for the FBI and HSI, and on their connection to the Defendant. (ECF No. 75, Tr. 279–98, 330–36; 504–535, 561–95.) Much of the record's background information is predicated on a slew of cellphone records and e-mails belonging to Mr. Panesar, Mr. Hastie, and Defendant, and

---

[6] For example, Defendant claimed that he was only shown two paper – not three. (ECF No. 76, Tr. 619–620.) Likewise, while Agent Wolf claimed that the Defendant reviewed all three documents for some time and in a calm manner. (ECF No. 75, Tr. 359–60.) Defendant, in contrast, claimed to only see them for seconds, without his glasses, and while in an anxious state. (ECF No. 76, Tr. 620–22.) On the audio, the Defendant can be heard trying to briefly sound out a name on the paper by stating "GRU . . .", though no such name exists on the papers. (ECF No. 75, Tr. 386–87.)

1   Defendants' corresponding TECS searches. (ECF No. 75, Tr. 311–30, 432–80.) In fact,
2   the evidence regarding Panesar and Hastie's activities was so profuse that the Court felt it
3   necessary to repeatedly instruct the jury that such evidence could only be considered for
4   specified, limited purposes (including background and willfulness), and could not be
5   considered for other reasons, so as to avoid unfair prejudice. (ECF No. 74, Tr. 200–01,
6   217; ECF No. 75, Tr. 438, 487–88; ECF No. 76, Tr. 739.)

7       As a result of all this, there is a "genuine possibility" that the jury members arrived
8   at different conclusions as to which statements actually pertained to the Constantino
9   Rivas-Pedrisco Record Check, and thus were thus false within the meaning 18 U.S.C. §
10  1001(a)(2). The Government's insistence to the contrary does not resolve that ambiguity.
11  (ECF No. 99 at 14–15.)

12      In certain false statement cases, courts have looked to the nexus of facts required to
13  prove each false statement in assessing the likelihood of jury confusion. *Compare United*
14  *States v. Holley*, 942 F.2d 916, 928–29 (5th Cir. 1991) (finding that a specific unanimity
15  instruction was required where "[t]he government was required to prove dissimilar facts
16  to show the knowing falsity of each statement. . .") *with United States v. North*, 920 F.2d
17  940, 950–51 (D.C. Cir. 1990) (finding that no specific unanimity instruction was
18  necessary because "the evidence was identical as to all five documents . . . thus, the jury
19  was restricted to one continuous course of events."). However, in such cases, the
20  similarity of the evidence functions to eliminate "a genuine risk that the jury [would be]
21  confused." *Id.* at 951. Here, as discussed above, the opposite is true. The evidence and
22  arguments considered by the jury– e.g., the low-quality audio recording, the
23  Government's misleading presentation, Agent Wolf's imprecise questioning and
24  impeachment, Defendant's less-than-clear statements, and the vast amount of background
25  information adduced at trial – created a genuine risk that the jury was confused. For that
26  reason, *North* is distinguishable. (ECF No. 99 at 6–10, 12–15.) Moreover, the weight of
27
28

16

1  the evidence, here, is not so overwhelming as to eliminate the risk of jury confusion. *Cf.*

2  *United States v. Silva*, 995 F.2d 234 (9th Cir. 1993), *as amended* (Sept. 15, 1993).

3  In light of the foregoing, the Court cannot conclude that the instant case "was

4  sufficiently simple and clear in its presentation that unanimity can be assumed based on

5  the general instruction." *United States v. Ferris*, 719 F.2d 1405, 1407 (9th Cir. 1983)

6  (Kennedy, J.). The substance of Defendant's four charged statements, the imprecision

7  and ambiguity surrounding his interview, and the volume of additional evidence in this

8  case – much of which refers to e-mails and record checks similar to those underlying the

9  subject false statements – together created a genuine possibility of jury confusion.

10  **3.   The absence of *Vitello* instructions underscores the jury's confusion.**

11  In addition to the Indictment and the trial record, a court may also consider the jury

12  instructions in assessing the presence of jury confusion. Here, the Court did not instruct

13  the jury as to the specific statements which formed the basis for the alleged false

14  statement. The Court did not explain to the jury that they had to find at least one

15  statement false and that they must be unanimous as to that false statement. And, as

16  observed in the next section, these failures prompted jury notes for further instruction.

17  In assessing the adequacy of the jury instructions, the Ninth Circuit decision in

18  *Vitello v. United States*, 425 F.2d 416 (9th Cir. 1970), is instructive. There, the district

19  court offered the following instructions:

20     (1) not to single out one instruction, but to consider the instructions as a
       whole; (2) that all instructions were important; (3) that it would be a
21     violation of their sworn duty to base the verdict on any law other than that
       given to them by the court; (4) the indictment was in one count only; (5) the
22     four essential elements to be proved in order to establish the crime of
       perjury; (6) that the three particulars in which appellant was alleged to have
23     testified falsely and knowingly, were contained in the single count of the
       indictment; (7) that the government need only prove, beyond a reasonable
24     doubt, the falsity of one of such particulars in order for the government to
       sustain its burden of proof; (8) that the government must prove each
25     essential element beyond a reasonable doubt; (9) that in every crime there

26

27

28

17

must exist a union or a joint operation of act and intent with the burden on
the prosecution to prove both act and intent beyond a reasonable doubt; and
(10) that in order to return a verdict it was necessary for each juror to agree,
in other words that their verdict must be unanimous.

*Id.* at 422. On appeal, the Ninth Circuit considered the defendant's argument that the court failed "to instruct the jury that all twelve jurors, before finding a verdict of guilty, must unanimously agree on the falsity of at least one of the statements as charged in the indictment." *Id.* The Court concluded that, "[u]nder the court's instructions, the only manner in which the jury could arrive at a unanimous verdict was to find guilt beyond a reasonable doubt on one or more of the three specifications of perjury." *Id.* at 423.

In the present case, the Court applies *Vitello* and, by comparison, finds that its jury instructions were deficient. The Court did not offer the jury either the sixth *Vitello* instruction identifying the particulars as to the false statements or the seventh instruction, i.e., "that the government need only prove, beyond a reasonable doubt, the falsity of one of such particulars in order for the government to sustain its burden of proof." *Vitello*, 425 F.2d at 422.

In light of this instruction's absence, the Court cannot conclude the jury acted unanimously. Even assuming the "recognized ability of the jury to follow instructions," *Vitello*, 425 F.2d at 422 (citing *Opper v. United States*, 348 U.S. 84, 95 (1954)), it is not clear what instruction would have directed the jury to unanimously determine that a particular statement was false. Rather, since only a general unanimity instruction was proffered, there is a "genuine possibility" that the jury concluded that some statement was false, without unanimously finding a single statement was false. (ECF No. 76, Tr. 798.)

### 4. The jury notes reflected the jury's confusion as to what was required to find the defendant guilty here.

A jury note can evince the jury's confusion as to the standard they must apply in rendering a unanimous verdict. *United States v. Echeverry* ("*Echeverry I*"), 698 F.2d 375, 377 (9th Cir.) (reversing a conviction for a single conspiracy to distribute cocaine that

18

allegedly lasted from December 1980 to June 1981 because of a jury note). In *Echeverry*, the jury questioned whether they could "consider a conspiracy that does not cover [an] entire time span" and whether they could "consider the existence of more than one conspiracy." *Id.* at 376. The judge instructed the jury to "determine whether the conspiracy charged . . . exist[ed] between two or more persons for some period of time, though not necessarily the entire period of time, within the dates charged in the indictment." *Id.* (emphasis removed). The Ninth Circuit found that this exchange evinced the jury's confusion on whether more than one conspiracy existed, and for what time period, such that the verdict was not necessarily unanimous. *Id.* at 377.

Here, the Indictment alleges four different statements by which Defendant ostensibly lied. (ECF No. 1 at ¶ 7.) In its opening statement, the Government identified these four statements and asserted that the Government would prove that each of the four statement was a false statement. (ECF No. 174, Tr. 149–50). In its closing argument, the Government explained that Mr. Martin was "only charged with four specific lies pertaining to the Constantino Rivas record check in the Indictment, and Constantino Rivas is Individual 1." (ECF No. 174, Tr. 751–52.) Both Parties also repeated some of the statements alleged in the Indictment in closing. (ECF No. 76, Tr. 747, 762.) The Court then instructed the jury that it was to "determine whether the defendant is guilty or not guilty of the charge in the indictment," and that whether "the defendant made a false statement" is a necessary element of that charge. (ECF No. 76 at 744.)

After jury deliberations began, the jury submitted a note specifically questioning their duty as to those statements, "Do we find guilty if any of the statements in the indictment are false, or do they all have to be false?". (ECF No. 78, Tr. 819) (hereinafter, the "jury's duty note.") At a minimum, the jury's duty note reveals that the Court had failed to instruct the jury on which statement(s) had to be found false to support a guilty verdict on Count 1. That is, the Court offered no instruction clarifying that, while the Government was not required to prove that all four statements were false, it was required

19

to prove at least one was false, with all 12 jurors unanimously agreeing as to the one false statement.

Further, the jury asked a second question, "In Jury Instruction Number 4, it states that if there is a lack of evidence, we need to find defendant not guilty. Can audio evidence not being clear – many parts of audio not clear – would this be lack of evidence? Is this part of the definition of 'lack of evidence'?". (ECF No. 78, Tr. 823–24.) This sequence of events shows that the jury was seeking guidance as to what statements had to be proven false to support a guilty verdict and what effect to give to the lack of clarity in the recordings that contained Mr. Martin's statement. While awaiting an answer to both questions, the jury returned a guilty verdict and the Court accepted it without further instructing the jury.

As in *Echeverry*,[7] the jury notes undermine the jury's unanimity as to the factual basis for the verdict. Specifically, the Court cannot "be certain that some portion of the jury, in casting a guilty ballot," found one statement was false "and failed to find enough evidence to believe that" another statement was false, "while other jurors envisioned" the opposite conclusion. *Echeverry I*, 698 F.2d at 377. In other words, the jury notes raise the possibility that the jury members convicted the defendant without first coming to a unanimous agreement that any one specific statement was false. And, the Court has "no means by which [it] can be certain" the jury avoided this error. *Id.*; *cf. United States v. Barany*, 884 F.2d 1255, 1258 (9th Cir. 1989) (finding the jury was not confused where the factual specifications were divided into separate counts).

---

[7] The Government's efforts to cabin *Echeverry* to conspiracy cases is also unpersuasive, (ECF No. 99 at 7 n.5) (collecting conspiracy cases where verdict was reversed for jury confusion), in light of the cases evidently applying the case to crimes other than conspiracy. *See, e.g.*, *Garcia-Rivera*, 353 F.3d at 792 (applying *Echeverry* and reversing a conviction for unlawful weapons possession); *United States v. Payseno*, 782 F.2d 832, 833 (9th Cir. 1986) (applying *Echeverry* and reversing extortion convictions for jury confusion).

1    In the Government's view, the jury's duty note clearly evinces an understanding

2 that it had to find at least one statement unanimously false. (ECF No. 99 at 6–10.) The

3 Government argues that either option posited by the jury's duty note – finding the

4 defendant guilty (a) "if any of the statements are false" or (b) if "all" of the statements are

5 false – would require the jury to find at least one statement false unanimously. (*Id.* at 6.)

6    The Court does not agree. The only clear understanding that can be drawn from the

7 jury's duty note is that the jury was not clearly instructed on how to treat the four

8 statements in the introductory allegations. Afterall, if the jury unanimously found Mr.

9 Martin made all four statements and that each statement was false, there would have been

10 no need for the jury note question how they should treat the statements. The jury's duty

11 note thus reveals that the jury had not found all four statements false and needed direction

12 from the Court in proceeding to a verdict.

13    Moreover, it is plausible that, in inquiring whether guilt could follow if "*any* of the

14 statements are false," (ECF No. 78, Tr. 819 (emphasis added)), the jury incorrectly

15 understood it must unanimously find there was *a* false statement – *not* that it had to

16 unanimously decide *which* statement was false. *See United States v. Garcia-Rivera*, 353

17 F.3d 788, 792 (9th Cir. 2003) (reversing a conviction for lack of unanimity where the

18 "jury could have concluded that they were required to decide unanimously only that

19 possession occurred during *any* of the three times enumerated, not that they had to

20 unanimously agree on which one") (emphasis in original); *United States v. Gilley*, 836

21 F.2d 1206, 1212 (9th Cir. 1988) (reversing where it was unclear if the jury unanimously

22 found the same five people were involved in an illegal gambling business over the same

23 thirty day period).

24    Lastly, the Government argues that a unanimity instruction was not required

25 because the evidence was identical as to all four statements and restricted to one

26 continuous course of events. (ECF No 99 at 13.) However, if the four statements

27 amounted effectively to the same lie, and concerned the same topic, logically the jury

28

1    would have found all four – or none – of the alleged false statements had been proved.

2    The jury's duty note reveals that this was not the case here. Thus, even though

3    Defendants' statements arose during one continuous course of events, the jury's

4    confusion is unsurprising given the lack of specific questioning preceding the statements,

5    the Parties' disputes as to what was in front of Mr. Martin, and the use of dissimilar

6    comparison terms in conjunction with pronouns in the statements.

7         Consequently, as the jury here expressly questioned how they should treat the

8    statements that form the factual basis of the instant conviction, and in light of the

9    applicable concerns discussed in *Echeverry*, the Court finds that this jury's notes support

10   a finding of jury confusion necessitating a new trial.

11   **III.    CONCLUSION**

12        In sum, the Court is "not free to hypothesize whether the jury indeed agreed to and

13   was clear on" which statement(s) unanimously constituted the "materially false, fictitious,

14   or fraudulent statement" required to find Defendant guilty. *Echeverry I*, 698 F.2d at 377;

15   18 U.S.C. § 1001(a)(2). Rather, because of the Indictment's ambiguous language, the

16   complexity of the evidence, the absence of necessary jury instructions, and the

17   concerning jury notes, the Court should have been alerted "to the potential for a

18   nonunanimous verdict" and cured the deficiency through a special instruction. *Echeverry*

19   *II*, 719 F.2d at 975; *see also Lapier*, 796 F.3d at 1097; *Vitello*, 425 F.2d at 422; *United*

20   *States v. Lee*, 19 F.3d 3. To hold otherwise contravenes the Supreme Court's admonition

21   that "[u]nanimity . . . means more than a conclusory agreement that the defendant has

22   violated the statute in question." *McKoy v. North Carolina*, 494 U.S. 433, 450 n.5 (1990)

23   (Blackmun, J., concurring) (citing with approval cases from five circuits, including the

24   Ninth Circuit in *United States v. Ferris*, 719 F.2d 1405, 1407 (9th Cir. 1983)).

25        For the foregoing reasons, the Court finds that the verdict here is invalid. After

26   becoming aware of the jury's confusion, the Court was required to clarify to the jury that

27

28
                                        22

it had to find the defendant guilty as to at least one statement unanimously. It did not. Consequently, the Court **GRANTS** Defendant's motion for a new trial.

The Court confirms the status hearing on June 18, 2020 at 1:00 p.m. at which time the parties are instructed to advise the Court how they intend to go forward in this case.

**IT IS SO ORDERED.**

Dated:  June 2, 2020

Hon. Gonzalo P. Curiel
United States District Judge

23

18-CR-2835-GPC